# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SARA THERESA PEDRO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:17-cv-985 |
| | ) | |
| DUKE UNIVERSITY and | ) | COMPLAINT AND |
| DUKE UNIVERSITY HEALTH | ) | JURY DEMAND |
| SYSTEM, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Sara Theresa Pedro hereby brings this action against Duke University and Duke University Health System, Inc., including their respective employees, agents, successors, and assigns (collectively, "Defendant Duke"), and alleges upon information and belief as follows:

## INTRODUCTION

1.      At its heart, this case presents a simple yet important question: Must a devout Catholic abandon fundamental tenets of her faith if she wishes to be employed as a nurse at Duke University Hospital?  Despite the fact that Defendant Duke has answered "yes" to this question, federal and state civil rights laws say otherwise.  Therefore, Plaintiff Sara Theresa Pedro brings this action to vindicate her rights under the law.

2.      An employee does not forfeit her right to practice her religion and abide by the tenets of her faith when she enters the workplace.

3. To the contrary, federal and state laws generally prohibit discrimination on the basis of religion.

4. Title VII specifically prohibits discrimination on the basis of religion, which includes "all aspects of religious observance and practice, as well as belief[.]" 42 U.S.C. § 2000e(j).

5. Therefore, under Title VII, an employer is required to reasonably accommodate an employee's sincerely held religious beliefs and religious practices, unless doing so would impose an undue hardship.

6. Ms. Pedro has worked as a nurse for close to a decade.

7. Because of her Catholic faith, she objects to assisting in abortions, dispensing birth control and contraceptives, and receiving as well as administering vaccines. Ms. Pedro's employer, Defendant Duke, discriminated against her because of these religious beliefs and practices.

8. Furthermore, after Ms. Pedro made known her religious beliefs and requested religious accommodations, Defendant Duke subjected her to a degrading series of actions designed to punish and retaliate against her for engaging in federally-protected activity.

9. The accommodations requested in this case by Ms. Pedro would not have imposed an undue hardship on Defendant Duke.

10. In fact, this complaint is filed more than ten months after Ms. Pedro made the second of two requests for religious accommodation, and

Defendant Duke has *still* not responded to Ms. Pedro with a final decision as to her second request or otherwise provided an explanation as to how the request presented an undue hardship.

11.     Defendant Duke has engaged in a course of conduct that was designed to discriminate and retaliate against Ms. Pedro because of her religion and her federally-protected activities, all with the intent of forcing her out of her job with Defendant Duke.

12.     Defendant Duke's conduct toward Ms. Pedro likewise violated her rights under other federal and state laws, as described more fully herein.

13.     Therefore, Ms. Pedro hereby sues under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as well as the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.*, and North Carolina statutory and common law.

## THE PARTIES

14.     Plaintiff Sara Theresa Pedro is a devout Catholic nurse, who currently resides in New York City.

15.     In August 2016, Ms. Pedro began work as a nurse for Defendant Duke in the Emergency Department of Duke University Hospital in Durham, North Carolina.  At some point after Defendant Duke hired Ms. Pedro, it became aware that Ms. Pedro is a devout Catholic.

3

16.     Ms. Pedro is currently on a personal leave of absence for medical reasons from Defendant Duke as a result of injuries Defendant Duke caused.

17.     Defendant Duke University is incorporated under the laws of the State of North Carolina with its principal place of business located in Durham, North Carolina.

18.     Defendant Duke University employs in excess of 500 employees and is subject to the requirements of Title VII of the Civil Rights Act of 1964.

19.     Defendant Duke University is an entity capable of being sued under both federal and North Carolina law.

20.     Defendant Duke University Health System, Inc., is incorporated under the laws of the State of North Carolina with its principal place of business located in Durham, North Carolina.

21.     Defendant Duke University Health System, Inc., employs in excess of 500 employees and is subject to the requirements of Title VII of the Civil Rights Act of 1964.

22.     Defendant Duke University Health System, Inc., is an entity capable of being sued under both federal and North Carolina law.

23.     Upon information and belief, at all times relevant to this complaint, Defendant Duke University acted as the parent corporation of Defendant Duke University Health System, Inc.

4

24.    At all times relevant to this complaint, Defendant Duke University provided centralized human resources, labor relations, and legal personnel to Defendant Duke University Health System, Inc.

25.    Additionally, upon information and belief, the relevant activities of Defendant Duke University and Duke University Health System, Inc., have been so interrelated and overlapping in terms of management, control, ownership, operations, finances, decisionmakers, and personnel policies and decisions as to constitute a "single employer" or "integrated enterprise."

26.    With respect to the allegations contained herein, Defendant Duke University and Defendant Duke University Health System, Inc., acted as alter egos of one another.

27.    Duke University Hospital in Durham, North Carolina, is owned, operated, and controlled by Defendant Duke.

28.    Defendant Duke is legally responsible for the actions of those employed by Defendant Duke at Duke University Hospital as well as all of the other individuals identified in this complaint as employees or agents of Defendant Duke.

## JURISDICTION AND VENUE

29.    This Court has federal question jurisdiction over Ms. Pedro's claims under federal law pursuant to 28 U.S.C. §§ 1331 and 1343 as well as 42 U.S.C. § 2000e-5(f)(1).

5

30.     Ms. Pedro's state law claims are properly before this Court pursuant to 28 U.S.C. § 1332 due to diversity of citizenship between the parties and the fact that the amount in controversy exceeds $75,000 and also pursuant to 28 U.S.C. § 1367(a) because Ms. Pedro's state law claims are so related to the claims in the action that are within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

31.     On August 1, 2017, the EEOC mailed Ms. Pedro a Right to Sue letter.

32.     This complaint has been timely filed.

33.     Ms. Pedro has complied with all applicable requirements for administrative exhaustion of her claims.

34.     Venue is properly laid in this court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because it is a judicial district in which the defendants reside as well as a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## FACTS

*Ms. Pedro is a Devout Catholic and Thus Cannot*
*Participate in the Taking of Innocent Human Life*

35.     Ms. Pedro takes seriously adherence to the tenets of her Catholic faith.

6

36.    She attends daily Mass and prays the Rosary of the Unborn, on which the Blessed Mother promises that every "Hail Mary" prayed with Love saves a baby from abortion, along with many other Catholic prayers and devotions on a daily basis.

37.    Until recently being evicted from her home due to an inability to pay her rent, she kept a miraculous image of the Blessed Mother on her wall above a home shrine she made alongside the American flag presented to her father at his retirement from the National Guard.

38.    As part of the exercise of her Catholic faith, Ms. Pedro strives to follow the Ten Commandments, which forbid—among other sins—murder.

39.    According to the official *Catechism of the Catholic Church*, to which Ms. Pedro adheres, abortion violates the Commandment that prohibits killing.  The *Catechism* states: "Human life must be respected and protected absolutely from the moment of conception."

40.    The *Catechism* also states: "Formal cooperation in an abortion constitutes a grave offense.  The Church attaches the canonical penalty of excommunication to this crime against human life."  In Catholicism, excommunication is the most severe penalty the Church can impose and results in, among other things, being prohibited from participating in public worship and receiving any of the Sacraments of the Church.

41.     Furthermore, in his encyclical *Evangelium Vitae*, Pope Saint John Paul II condemned abortion as "a most serious and dangerous crime" that "always constitutes a grave moral disorder, since it is the deliberate killing of an innocent human being."

42.     In accordance with her Catholic faith, Ms. Pedro cannot participate in the taking of innocent, unborn human life through complicity with or participation in abortion.

43.     Abortion is the intentional termination of an innocent human life.

44.     Numerous other Christian denominations in the United States share the same respect for human life at all stages of development as the Catholic Church on the issue of abortion, including the Eastern Orthodox Church, the Southern Baptist Convention, the African Methodist Episcopal Church, the Presbyterian Church in America, the Orthodox Presbyterian Church, the Lutheran Church-Missouri Synod, the Reformed Church in America, the Christian Reformed Church in North America, the Mennonite Church USA, the Assemblies of God, the Church of God in Christ, the Church of the Nazarene, the Church of Jesus Christ of Latter Day Saints, the Coptic Church, and the Anglican Church in North America.  The same is true for countless nondenominational evangelical Christian churches.  Orthodox Judaism, Hinduism, and traditional Buddhism also oppose abortion except when the mother's life is in danger.

8

45.     The Catholic Church prohibits all forms of contraception and birth control because, in order to have a valid marriage (a necessary condition for moral sexual activity), the man and woman must be open to the possibility of children and are prohibited from using artificial methods to prevent conception.

46.     The Catholic Church also prohibits the use of hormonal contraceptives because such contraceptives reduce the likelihood that a conceived human life will implant in the uterus, thereby increasing the likelihood that an innocent human life will be aborted.

47.     Ms. Pedro has multiple concerns and sincerely held religious beliefs about vaccines, especially the fact that many vaccines are derived from aborted fetal cells.  As previously stated, Ms. Pedro strives to obey the Ten Commandments, and the First Commandment is that God must be placed above all else.

48.     To remain faithful to her Catholic religious beliefs, Ms. Pedro cannot participate in abortions, dispense birth control or contraceptives, or administer or receive vaccines.

49.     Ms. Pedro's convictions regarding abortion, birth control, contraceptives, and vaccines constitute sincerely held religious beliefs.

50.     Ms. Pedro's religious beliefs regarding abortion, birth control, contraceptives, and vaccines are protected by Title VII.

9

*Ms. Pedro Achieves Her*
*Dream of Becoming a Nurse*

51.    Ms. Pedro's faith motivated her to pursue a career as a nurse because, as a nurse, she could help heal the sick.

52.    Ms. Pedro received her nursing education at Mount Saint Mary College, graduating in 2008 with a Bachelor of Science in Nursing (BSN).

53.    At graduation, Ms. Pedro received the Spirit of Nursing Award in recognition of her love for nursing, her outstanding dedication to her patients, and her deep compassion for those who suffer.

54.    After graduating from Mount Saint Mary College, Ms. Pedro sat for her nursing boards on Fulton Street in New York City.  Following her examination, she went to daily Mass at Our Lady of Victory and prayed to God that she would pass.  She promised God that, if she passed her boards, she would serve Him as a nurse and always strive to be faithful to His teachings.

55.    Ms. Pedro passed her nursing boards and was licensed as a nurse in the State of New York in 2008.

*After Working in New York, Ms. Pedro Moves to*
*North Carolina to Work for Defendant Duke*

56.    Ms. Pedro worked as a nurse in New York City for eight years.

57.    She first worked in the Neuroscience Unit and Neurosurgery ICU at NYU Langone Medical Center ("NYU") for five years.

58.    She then worked for three years in the Burn ICU at New York Presbyterian-Weill Cornell Medical Center ("Cornell").

59.    Additionally, while in New York, she performed *per diem* home care/private duty nursing and also trained to be a birth doula.

60.    Ms. Pedro compiled an impeccable record while working as a nurse in New York.

61.    In fact, while working at NYU, Ms. Pedro helped develop a new hospital guideline for patient care in pentobarbital comas, which was featured as a poster presentation at the April 2012 conference of the American Association of Neuroscience Nurses in Seattle, Washington.

62.    During her eight years of working in New York, Ms. Pedro never once received any form of discipline from her employers.

63.    After much prayer and deliberation, Ms. Pedro decided to move to the Triangle and work as a nurse in the Emergency Department of Duke University Hospital.

64.    Ms. Pedro's employment with Defendant Duke began in August 2016.

65.    In August 2016, Ms. Pedro attended approximately two weeks of classroom orientation with Defendant Duke.

66.    On August 15, 2016, while still in classroom orientation, Ms. Pedro received a document regarding Defendant Duke's policies from Clinical

11

Team Lead Sandy Falise. Ms. Falise served as one of Defendant Duke's principal educators during Ms. Pedro's orientation.

67. In explaining the aforementioned document to six new Emergency Department nurses (including Ms. Pedro), Ms. Falise discussed how Duke University Hospital operates. She stated that Defendant Duke does not allow employees a religious accommodation with regard to abortion. When Ms. Falise discussed the section titled, "Patient Care and Staff Beliefs," she explained that even if a nurse has a religious objection to abortion, she must still participate in aborting a baby because Defendant Duke categorically refuses to grant this religious accommodation.

68. Ms. Falise then further stated that a large number of abortions are performed in Defendant Duke's Emergency Department.

69. When making each of the statements described above, Ms. Falise was speaking on behalf of, and with authority from, Defendant Duke.

70. Additionally, due to her seniority and the nature of her position, Ms. Falise is privy to information regarding how Defendant Duke reviews and decides requests for religious accommodation and other human resource matters.

71. Ms. Falise's statements about Defendant Duke's policy on religious exemptions had a chilling effect on the exercise of Title VII rights.

12

72. Ms. Falise's statements about Defendant Duke's policy on religious exemptions constituted religious discrimination and harassment in violation of Title VII in that they required or coerced employees to abandon or alter religious beliefs or practices as a condition of employment with Defendant Duke.

73. Defendant Duke, acting through Ms. Falise, intended the aforementioned statements regarding religious accommodations to intimidate and dissuade employees from exercising their rights under Title VII.

74. Furthermore, the statements of Ms. Falise evidenced Defendant Duke's hostility and discriminatory attitude towards persons of religious faith.

75. The existence and enforcement of a policy like that described by Ms. Falise violates (1) Title VII; (2) 42 U.S.C § 300a-7 (also known as the Church Amendments); (3) the Weldon Amendment; and (4) Section 1303(b) of the Affordable Care Act, both as written and as interpreted and implemented by President Obama's Executive Order No. 13535.

76. At all relevant times during the August 2016 training in which Ms. Pedro participated, Ms. Falise was an employee of Defendant Duke and acting within the course and scope of her employment with Defendant Duke.

13

77.    The acts and omissions of Ms. Falise in this case are imputable to Defendant Duke under the doctrines of *respondeat superior* and vicarious liability.

*Ms. Pedro Requests Reasonable*
*Religious Accommodations*

78.    Though she was fearful of how Defendant Duke would respond (in light of Ms. Falise's comments), Ms. Pedro nevertheless made a request for religious accommodation by letter dated October 5, 2016.

79.    Specifically, Ms. Pedro's letter of October 5, 2016, requested that she be exempt from receiving vaccines for religious reasons and provided a description of her pro-life religious views.

80.    Defendant Duke granted Ms. Pedro's request on October 27, 2016.

81.    On the same day (October 27, 2016), one of Defendant Duke's Clinical Team Leads in the Emergency Department, Sarah Morgan Oakley (now Brooks), asked Ms. Pedro for a copy of her letter of October 5th and also asked that it be forwarded to Liset Denis, Ms. Pedro's nurse manager.

82.    As a result, Ms. Pedro's supervisors in the Emergency Department immediately became aware of Ms. Pedro's religious beliefs as well as the fact that those beliefs compel her to adhere to pro-life positions.

*Defendant Duke Begins to Discriminate Against*
*Ms. Pedro Because of Her Religion and Retaliate*
*Against Her Because She Engaged in Protected Activity*

83.     Despite granting Ms. Pedro's request for a religious accommodation, Defendant Duke thereafter began a pattern of employment actions and decisions adverse to Ms. Pedro that negatively affected her status as an employee of Defendant Duke and more generally as a nurse.

84.     Prior to making a request for religious accommodation and making her religious views known to Defendant Duke, Ms. Pedro had not been disciplined or reprimanded by Defendant Duke.

85.     Barely two weeks after two of Ms. Pedro's supervisors received the October 5th letter describing her religious beliefs, however, Ms. Denis (one of the two supervisors who had received a copy of Ms. Pedro's request for religious accommodation) and Ms. Falise (who had stated during Ms. Pedro's training that employees can never refuse to participate in an abortion in the Emergency Department) asked to meet with Ms. Pedro on November 15, 2016.

86.     During that November 15, 2016 meeting, Ms. Denis and Ms. Falise provided vague and unsubstantiated criticisms of Ms. Pedro's work performance in the Emergency Department.

87.     Both Ms. Denis and Ms. Falise, however, emphasized that they had no concerns about Ms. Pedro's clinical skills.

15

88.   Defendant Duke has never provided any objective evidence that Ms. Pedro's work performance was less than satisfactory.

89.   The criticism Ms. Pedro received during the November 15, 2016 meeting had no basis in fact, but was rather a pretext designed to mask Defendant Duke's unlawful discrimination and retaliation against Ms. Pedro.

90.   During the November 15, 2016 meeting, Ms. Denis stated that she would convene a meeting including herself, Ms. Pedro, and Ms. Pedro's preceptor in the Emergency Department, Amy Grubbs, on November 17, 2016.

91.   Ms. Denis failed to convene the meeting on November 17, 2016, as had been represented merely two days earlier.

92.   On November 25, 2016, Ms. Pedro emailed Clinical Team Lead Georgianne Mullis to inquire about a clinical ladder promotion, which would have provided her an increase in pay.

93.   On November 26, 2016, Ms. Mullis emailed Ms. Pedro in response, saying that she would talk with her about the next steps in applying for a promotion.

94.   Ms. Mullis, however, never spoke with Ms. Pedro, and on December 8, 2016, Ms. Mullis emailed to say that Ms. Falise (who had stated during Ms. Pedro's training that employees can never refuse to participate in

an abortion in the Emergency Department) had informed her that she (Ms. Pedro) was not able to apply for the promotion.

95. Notably, as described more fully below, the email from Ms. Mullins to Ms. Pedro denying her the ability to seek the clinical ladder promotion came the day after Ms. Pedro made the second of her two requests for religious accommodation based on her pro-life religious views.

96. Due to concern as to why she was still considered to be in her "orientation" period, even though her cohorts were being, or had already been, moved out of "orientation" and into regular status, Ms. Pedro emailed Ms. Denis and Ms. Falise on November 30, 2016, to inquire about this issue.

97. Neither Ms. Denis nor Ms. Falise responded to Ms. Pedro's email of November 30, 2016.

98. When she made inquiries of other supervisors in November and December as to the reason for her excessive "orientation" period, Ms. Pedro received differing and contradictory answers.

99. Upon information and belief, other members of Ms. Pedro's cohort had not made requests for religious accommodations and did not share Ms. Pedro's same religious views.

100. Accordingly, Defendant Duke kept Ms. Pedro on "orientation" longer than necessary so as to discriminate and retaliate against her with the goal of forcing her to quit.

101. Due to the excessive length of her "orientation" period and other harassment initiated by her supervisors, Ms. Pedro became the subject of gossip, rumors, and degrading and embarrassing comments by some of her fellow employees in the Emergency Department.

102. For example, on one occasion, Ms. Pedro heard nurses Rachel Byrne and Holly Glover talk about her being terminated, which resulted from her supervisors' sharing sensitive personnel issues with her fellow employees.

103. On another occasion, when nurse Rhonda Charles did not immediately see Ms. Pedro, Ms. Charles told Ms. Grubbs that she was happy Ms. Pedro was no longer working there.

104. Ms. Pedro's supervisors also encouraged nurse Jessica Torres to complain about Ms. Pedro's work performance and, upon information and belief, even failed to discipline Ms. Torres in order to persuade her to provide negative feedback regarding Ms. Pedro.

105. Additionally, when the mother of a young patient wrote a note praising the care Ms. Pedro had provided, one or more employees of Defendant Duke ensured the letter was hidden or destroyed.

106. Similarly, Ms. Pedro's supervisors failed to tell Ms. Pedro about letters and other forms of praise she would receive from her patients.

18

107. Ms. Pedro reported these comments and other harassing actions to her supervisors, but her supervisors failed to take any steps to remedy the conduct and even encouraged harassment of Ms. Pedro.

108. This harassment and Defendant Duke's failure to take remedial action were both motivated by Ms. Pedro's religious beliefs as well as her protected activity.

109. On December 1, 2017, Ms. Denis asked Ms. Pedro to meet with her and Amy O'Connor, a Clinical Team Lead in Defendant Duke's Emergency Department. During this meeting, Ms. Pedro was presented with a Performance Improvement Plan that was inexplicably dated November 15, 2016.

110. The meeting of December 1, 2016, was the first time Ms. Pedro had been presented with, or had otherwise seen, this Performance Improvement Plan. Ms. Denis asked Ms. Pedro to sign this document. When Ms. Pedro expressed concern that the allegations listed were untrue, Ms. Denis replied that she (Ms. Pedro) would be able to change it later.

111. Ms. Pedro was thereby coerced into signing the Performance Improvement Plan because she was fearful that, if she refused to sign, Defendant Duke would claim she was being insubordinate.

112. Also during the December 1, 2016 meeting, it was stated that Ms. Pedro would be formally disciplined for the sole reason of not meeting with

19

her preceptor, Ms. Grubbs, on November 17th, even though the failure to have said meeting was the fault of Ms. Denis rather than Ms. Pedro.

113.  On December 7, 2016, Ms. Pedro submitted another request for religious accommodation, as was her right under the law.

114.  This request for religious accommodation read, in pertinent part, as follows:

Dear Sir or Madam:

[. . .]

Since abortion is a grave violation of my religious beliefs, I am unable to assist with or participate in an abortion in any way, including giving drugs intended to induce an abortion.

Methods of birth control and contraception are also grave violations of my religious beliefs, so I am unable to administer drugs intended as birth control or contraception.

As outlined in my previous request for religious accommodation dated on October 5, 2016, vaccines are a violation of my religious beliefs.  Therefore, I am unable to administer any vaccines.

[. . .]

Thank you for your time and attention to this matter.

Sincerely,
Sara Pedro

115.  Defendant Duke and, more specifically, Ms. Pedro's supervisors in the Emergency Department, were not pleased that Ms. Pedro had now made two requests for religious accommodation.

116. When asking Ms. Pedro about her second religious accommodation request, Frank DeMarco, who was at the time Defendant Duke's Emergency Department Clinical Operations Director, said he did not consider it to be a request for a religious accommodation but rather a "dilemma."

117. On December 8, 2016—the day after making her second request for religious accommodation—Ms. Pedro was disciplined by means of a written warning from Ms. Denis for not satisfying the benchmarks set out in the Performance Improvement Plan.

118. The reasons for the written warning had therefore expanded beyond the sole basis given a few days earlier on December 1, 2016—namely, Ms. Pedro's not meeting with her preceptor.

119. Moreover, with only one exception, the benchmarks set out in the Performance Improvement Plan did not even become due until seven days later on December 15, 2016.

120. Accordingly, in violation of Defendant Duke's own policies and procedures, Defendant Duke disciplined Ms. Pedro without affording her an opportunity to make any necessary improvements.

121. The areas of alleged deficiencies described in the written warning of December 8, 2016, had no basis in fact, but were rather a pretext

designed to mask Defendant Duke's unlawful discrimination and retaliation against Ms. Pedro.

122.   During the meeting with Ms. Denis on December 8, 2016, at which she was given this written warning, Ms. Pedro asked why she was still in "orientation" while her cohorts were being advanced.  Ms. Denis denied having knowledge of the reasons for this action, but indicated that it was a decision made by Ms. Falise.  (Again, it was Ms. Falise who stated during Ms. Pedro's training that employees can never refuse to participate in an abortion in the Emergency Department.)

123.   When Ms. Pedro said to Ms. Denis in the December 8th meeting that she had not once received any form of disciplinary action in the previous eight years that she had worked as a nurse, Ms. Denis responded by saying that she did not care what happened before Ms. Pedro came to work for Defendant Duke.

*Defendant Duke Places Ms. Pedro on*
*Administrative Leave for Pretextual Reasons*

124.   After the December 8, 2016 meeting, Ms. Pedro attempted to formally dispute the written warning through Defendant Duke's human resources representatives.

125.   On December 22, 2016, Ms. Pedro met with Monica Ziegler, a human resources representative of Defendant Duke, to complete paperwork

necessary to file a dispute against the written warning that she had been given on December 8.

126.   Prior to the meeting with Ms. Ziegler, Ms. Pedro emailed Coral May, Ms. Pedro's human resources representative, and Ms. Ziegler regarding concerns that she was being discriminated against.

127.   During her meeting with Ms. Ziegler, Ms. Pedro asked whether her email asserting that she was being discriminated against on the basis of her religion had been received.  Ms. Ziegler confirmed that she did indeed receive the email and informed Ms. Pedro that Ms. May would address her concerns when she returned from vacation on January 3, 2017.

128.   To Ms. Pedro's knowledge, Defendant Duke has never completed an investigation into Ms. Pedro's allegations or otherwise addressed her concerns about discrimination and harassment.

129.   Both Ms. Pedro's complaints to her supervisors about harassment from her co-workers, and her complaints to Defendant Duke's human resources personnel about suspected religious discrimination constituted activity protected by Title VII.

130.   Both Ms. Pedro's complaints to her supervisors and her complaints to Defendant Duke's human resources personnel were reasonable.

131.   Nevertheless, Defendant Duke failed to take reasonable steps to prevent and promptly correct the actions complained of by Ms. Pedro.

132. Upon information and belief, Ms. Pedro's supervisors in the Emergency Department (including Ms. Denis and Ms. Falise) quickly became aware that Ms. Pedro had complained to Defendant Duke's human resources personnel regarding suspected religious discrimination.

133. On December 30, 2016—a mere eight days after complaining to Duke about alleged religious discrimination and thus engaging in activity protected by Title VII—Ms. Pedro was asked to attend a meeting with Ms. Denis and her preceptor, nurse Rebecca Padilla-Burgos.

134. In the December 30, 2016 meeting, Ms. Denis informed Ms. Pedro that she was being placed on paid administrative leave effective immediately.

135. Once again, the reasons provided by Defendant Duke for its decision had no basis in fact, but were rather a pretext designed to mask Defendant Duke's unlawful discrimination and retaliation against Ms. Pedro.

136. Also during the December 30, 2016 meeting, while disciplining Ms. Pedro, Ms. Denis inquired into the status of Ms. Pedro's request for a religious accommodation.

137. Ms. Denis further stated that she wanted to know the results of the request for a religious accommodation before making a final decision about Ms. Pedro's administrative leave.

138. Such statements by Ms. Denis constitute direct evidence of unlawful discrimination and retaliation.

24

139. By placing Ms. Pedro on administrative leave, human resources personnel—pursuant to Defendant Duke's policies—were prevented from further investigating Ms. Pedro's allegations of religious discrimination, retaliation, and harassment as well as her challenge to her written warning.

140. Therefore, Defendant Duke did not exercise reasonable care to prevent discriminatory, retaliatory, and harassing actions and further failed to have in place measures to prevent and correct illegal discrimination, retaliation, and harassment.

141. Defendant Duke's decision to place Ms. Pedro on administrative leave was based on her religion and the fact that she had engaged in protected activity and was further designed and motivated to cover up the true (and illicit) reasons for Defendant Duke's disciplining of Ms. Pedro.

142. In addition to its other adverse effects, subjecting Ms. Pedro to discipline would also threaten her professional standing (both at Defendant Duke and generally) and her licensure as a nurse.

143. At all times relevant to this complaint, Ms. Pedro's work for Defendant Duke was more than satisfactory.

144. While working for Defendant Duke, Ms. Pedro had no problems with absenteeism, tardiness, insubordination, or violation of any specific hospital rule or policy.

25

145. In fact, on more than one occasion, Ms. Pedro distinguished herself in the course of her work, often preventing acts of malpractice or other violations of law by Defendant Duke. Examples include, but are not limited to, the following:

    a. While Ms. Pedro was assisting an HIV-positive patient, the patient vomited large amounts of blood onto Ms. Pedro, leaving her shoes and clothes saturated with blood. Throughout the situation, though, Ms. Pedro remained calm and continued to ensure the patient received proper care. Afterwards, Ms. Pedro had to discard her scrubs and shoes and receive an HIV test due to the fact that she had been exposed to this virus.

    b. While assigned to work in the psychiatric section of the Emergency Department, Ms. Pedro learned a nurse had provided a patient a television remote control, which the patient then used to engage in a sex act in one of the hospital rooms. Ms. Pedro was the only nurse who thought to ensure that proper cleaning and sanitization were undertaken so as to protect the health and safety of staff and other patients.

    c. Ms. Pedro received a patient who had been assaulted by a brick to his head. When she learned the patient was to be discharged, Ms. Pedro approached the attending physician to state that,

26

based on the patient's clinical findings, she strongly suspected he had a fracture. On reexamining an x-ray of the patient, doctors discovered the x-ray had been misinterpreted previously and that the patient did indeed have a fracture as Ms. Pedro suspected.

d. One of Ms. Pedro's preceptors, Amy Grubbs, asked Ms. Pedro to prepare a dose of Decadron for a teenage patient. Ms. Pedro voiced concern about the amount of the dose and sought clarification from the pharmacist on the correct dose. The pharmacist then agreed with Ms. Pedro. An incident report indicating how Ms. Pedro prevented this dosing error was then filed.

e. On November 27, 2016, Ms. Pedro was assigned as the primary nurse for a three-year-old boy. His mother was greatly displeased at the care he had received as a patient prior to the beginning of Ms. Pedro's shift. As a result of the level of care Ms. Pedro then provided, the boy's mother later wrote a letter praising the care she gave him.

f. Ms. Pedro is skilled at placing IV's in patients, particularly in pediatric and infant patients. In one specific instance, she placed an IV on the first attempt in a 5-pound premature baby.

27

g. A veteran nurse with decades of experience commented to Ms. Pedro that she had exceptional pediatric IV skills and clinical capabilities.

h. Nurse Daniel Stanley, a so-called "Epic Superuser" with advanced training in Defendant Duke's new electronic trauma charting system, specifically praised Ms. Pedro for the quality of her charting.

i. On December 21, 2016, Ms. Pedro received a trauma patient transferred to her from another section of the Emergency Department. Ms. Pedro noticed that he had difficulty breathing, which she addressed immediately. Although a trauma reassessment is required for every trauma patient once every hour, Ms. Pedro noticed that no trauma reassessment had been documented on this patient for more than six hours, and even the last assessment recorded was incomplete. Ms. Pedro then documented a thorough physical assessment to ensure proper care. Courtney Axner, the oncoming nurse for the next shift, specifically commended Ms. Pedro for this work

j. On December 29, 2016, Ms. Grubbs was supplying a patient with a meal tray for dinner, but Ms. Pedro was concerned about his clinical presentation. Though Ms. Grubbs was unalarmed, Ms.

28

Pedro checked his blood glucose and found it to be significantly abnormal. The patient was then treated for hypoglycemia.

k. Ms. Pedro received a trauma patient into the Emergency Department who had been involved in a serious motor vehicle accident. The patient admitted he had been using illicit drugs prior to the accident, and his physical assessment and behavior were consistent with illicit drug use. Ms. Pedro then asked a Patient Care Technician to obtain evidence bags for his clothes. Nurse Melissa Robinson, however, would not allow the Patient Care Technician to do this and told Ms. Pedro, "We don't do that here." Ms. Pedro then raised concerns that the Emergency Department at Defendant Duke was unlawfully withholding information from law enforcement.

l. Several weeks after this incident, on December 27, 2016, Clinical Nurse Specialist Ann White emailed the nurses in the Emergency Department a new guideline on obtaining and communicating blood and urine sample results to law enforcement. Ms. Pedro thoroughly reviewed the new guidelines and emailed Ms. White several questions, especially since the new guidelines conflicted with instructions previously provided by her supervisors. Ms. White responded and said, "What you were told is wrong. That is

29

why we have written this document as we have not been complying with the law by such refusal to give information to law enforcement." The verbatim text of Ms. Pedro's question and Ms. White's response were then used at the January 2017 Emergency Department staff meeting in explaining the new policy.

146. At no time did Ms. Pedro ever jeopardize or adversely affect the quality of care received by any patient of Defendant Duke.

147. At no time has Defendant Duke ever been able to substantiate any concern about Ms. Pedro's clinical skills or knowledge.

148. During the December 30th meeting, Ms. Denis stated that she would give Ms. Pedro a final decision about her administrative leave by 5:00 pm on January 4, 2017.

149. Ms. Pedro received no such answer from Defendant Duke at any time on January 4, 2017.

150. On January 12, 2017, however, Ms. Pedro received a letter dated January 6, 2017, from Lynne Dietch, Defendant Duke's Director of Staff and Labor Relations.

151. The letter from Ms. Dietch stated that Defendant Duke was *still* investigating whether it could accommodate Ms. Pedro's request for a religious accommodation.

30

152.   Also on January 12, 2017, Ms. Pedro emailed Ms. Denis and Ms. May, continuing to raise multiple concerns about Defendant Duke's handling of her administrative leave.

153.   On January 13, 2017, Ms. Deitch emailed Ms. Pedro asking for an explanation as to what Ms. Pedro meant by the word "vaccines" in her request for religious accommodation.

154.   On January 16, 2017, Ms. Pedro responded to Ms. Deitch seeking clarification of her question, but Ms. Pedro did not receive any response until she emailed her again on January 23, 2017.

155.   On January 23, 2017, Ms. Pedro emailed Ms. Deitch, Ms. May, Ms. Denis, and Ms. Yvonne Spurney to again raise concerns about repeated discrimination and harassment.

156.   On January 25, 2017, Ms. Deitch sent Ms. Pedro a hostile email challenging her request for a religious accommodation.

157.   In her email of January 25, 2017, Ms. Dietch advised Ms. Pedro that, if she had such concerns, she could call Cynthia Clinton, Assistant Vice President for Harassment, Discrimination and Compliance, in Duke University's Office of Institutional Equity.

158.   Ms. Dietch's email of January 25, 2017, was the first time that Ms. Pedro had been directed to contact Ms. Clinton.  Ms. Pedro emailed Ms. Clinton the core of her concerns the same day.

159. During this time, it also became necessary for Ms. Pedro to renew her ACLS (nursing) certification. Due to the fact that she was still on administrative leave on the date of the test (January 5, 2017), as well as other failures on the part of Defendant Duke, Ms. Pedro was unable to attend the ACLS class and testing provided by Defendant Duke.

160. As a result, Ms. Pedro had to pay for a private ACLS class herself and renew her certification on her own. Defendant Duke nonetheless charged Ms. Pedro for the cost of the ACLS class she was unable to attend due to Defendant Duke's own actions.

*Defendant Duke Attempts to Interfere*
*with the EEOC Investigative Process*

161. On January 26, 2017, Ms. Denis emailed Ms. Pedro to ask her to meet with her and Yvonne Spurney the next day on January 27, 2017.

162. In response, on January 26, 2017, Ms. Pedro emailed Ms. Denis, Ms. Deitch, Ms. May, Ms. Spurney, and Ms. Clinton to inform them that she had complained of religious discrimination to the EEOC.

163. Ms. Pedro also emailed Ms. Denis, Ms. Deitch, Ms. May, and Ms. Spurney to inform them that she had retained an attorney and that she wanted him to attend the meeting with her.

164. The email from Ms. Pedro also politely asked Defendant Duke to have an attorney present at the meeting.

165.   The presence of counsel for both parties at the meeting of January 27th would have been beneficial and prudent for each side, given that Ms. Pedro had already made an internal complaint and had also contacted the EEOC to initiate a formal investigation of Defendant Duke's conduct.

166.   Ms. Pedro received no response from Defendant Duke on January 26, 2017.

167.   Moments before Ms. Pedro was about to leave her home to report for the meeting on January 27th, she finally received a response to her email of the prior day.

168.   In the email, Defendant Duke prohibited Ms. Pedro's attorney from being present during the meeting, even though the meeting with Ms. Denis and Ms. Spurney would address her complaint to the EEOC.

169.   Ms. Pedro then participated in a conference call that included herself, her attorney, and an in-house attorney for Defendant Duke, Kate Hendricks of Duke University's Office of Counsel.

170.   In that call, Ms. Hendricks reiterated Defendant Duke's denial of Ms. Pedro's request to have an attorney presenting during the meeting with Ms. Denis and Ms. Spurney.

171.   Ms. Hendricks further stated that Ms. Pedro's EEOC charge was a valid topic of discussion during the meeting with Ms. Denis and Ms. Spurney.

172.   As such, Defendant Duke attempted to have *ex parte* discussions with Ms. Pedro, even though she was represented by counsel, about a matter before the EEOC without having her attorney present.

173.   Upon information and belief, statements made by Ms. Pedro and other information obtained during the meeting that Defendant Duke sought to conduct with Ms. Pedro on January 27, 2017, would have been shared with Defendant Duke's legal counsel and used by Defendant Duke to defend against the EEOC charge filed by Ms. Pedro.

174.   During the conference call with Ms. Hendricks, Ms. Pedro's attorney appealed to Ms. Hendricks on the grounds of professional courtesy between fellow members of the Bar.

175.   In response, Ms. Hendricks stated that Defendant Duke has such a large number of employee complaints that it would be impossible for its legal department to accommodate requests to discuss an employee's concerns in person with the employee's counsel.

176.   At all times relevant to this complaint, Defendant Duke's Office of Counsel has employed a staff of over a dozen attorneys, including Ms. Hendricks.

177.  Additionally, Defendant Duke has ready access to highly skilled and knowledgeable outside counsel.

178.  Ms. Pedro began to hyperventilate and suffer a severe panic attack as a direct result of Ms. Hendricks's response.

179.  Ms. Pedro's attorney then again called Ms. Hendricks and was told she was unavailable.  He left her a voicemail asking her to return his call.  She never did.

180.  Ms. Pedro thereafter sought and received immediate medical attention from a WakeMed urgent care facility.

181.  After being discharged from WakeMed, Ms. Pedro sought follow up care from Sara Lynn Rooker, M.D., of WakeMed, as well as Whitney Johnson, LPC.

182.  After assessing Ms. Pedro, Ms. Johnson referred Ms. Pedro for trauma counseling several times per week.

183.  Ms. Pedro then met with Kathleen Hyland, Psy.D., L.P., for trauma counseling.  Following a psychological examination, Dr. Hyland opined, by letter dated February 6, 2017, that Ms. Pedro was "experiencing significant psychological distress and . . . struggling with maintenance of daily function."  Dr. Hyland further opined that Ms. Pedro was unable to return to work, as it would likely exacerbate her symptoms.

35

184. Ms. Pedro was, therefore, medically unable to return to work and began availing herself of her paid time off through a personal leave of absence for medical reasons until her paid time off was entirely depleted.

185. Even though she has exhausted her paid time off, Ms. Pedro is still unable to return to work.

186. Though Ms. Pedro had been hopeful that Defendant Duke would grant her second request for religious accommodation, based on her first-hand experience while working for Defendant Duke, Ms. Pedro contends that Defendant Duke never intended to grant her second request for a religious accommodation, but Defendant Duke also lacked any valid grounds to deny her request. Ms. Pedro contends that Defendant Duke therefore intended to force her from her position rather than grant her second request for religious accommodation, which included her request to be excused from assisting in any abortions.

*Defendant Duke Continues to Harass*
*Ms. Pedro and Deny Her Pay and Benefits*

187. Prior to the meeting set by Defendant Duke for January 27, 2017, Defendant Duke offered Ms. Pedro the option of returning to work *or taking a personal leave of absence*.

188. After Ms. Pedro suffered her medical emergency on January 27th and was therefore unable to return to work, Ms. Pedro emailed her

36

supervisor to inform her that she was medically unable to attend the meeting.

189.  Following receipt of medical attention at WakeMed, Ms. Pedro emailed her supervisor that she had a medical note excusing her from work on January 28, 2017.

190.  Despite the fact that Ms. Pedro had expressly been given the option of taking a personal leave of absence and she informed Defendant Duke of her decision to do so *more than the required amount of time prior to her previously scheduled shift of January 28, 2017*, Defendant Duke nevertheless recorded Ms. Pedro's absence as "unscheduled."

191.  An "unscheduled" absence is considered a basis for discipline.

192.  Subsequent efforts to inquire of Defendant Duke as to whether it indeed considered this "unscheduled" absence to be a basis for discipline of Ms. Pedro went unanswered by Defendant Duke.

193.  Wrongfully classifying Ms. Pedro's absence as "unscheduled" constituted retaliation for her protected conduct, including filing a charge with the EEOC.

194.  Defendant Duke further engaged in unlawful harassment and retaliation of Ms. Pedro in several ways following the incident of January 27, 2017.

195.   Defendant Duke failed to correct Ms. Pedro's address with her insurers when Ms. Pedro informed Defendant Duke that this information was out of date.

196.   Notably, one of her insurers, Cigna, previously had Ms. Pedro's current address correct, but Defendant Duke changed it to one of her old addresses at some point during her employment.

197.   Again, attempts to inquire of Defendant Duke as to Ms. Pedro's concerns with the address being provided by Defendant Duke to her insurers went unanswered.

198.   Defendant Duke moreover failed to provide timely and proper payment to Ms. Pedro after January 27, 2017.

199.   More specifically, Ms. Pedro was not timely compensated for the pay period of 1/23/17 to 2/5/17.

200.   Ms. Pedro had specifically made written requests for paid time off to cover part of this pay period (1/27/17-2/5/17).

201.   Defendant Duke nevertheless inexplicably failed to honor Ms. Pedro's requests for paid time off, even though Ms. Denis emailed Ms. Pedro that it would apply her PTO to January 27 and January 28, and only then compensated her well after it was due to be paid to her.

202.   Additionally, at the same time, Defendant Duke issued Ms. Pedro a check that included thirty-six hours of paid administrative leave, even

38

though it had previously informed her in writing that her paid administrative leave ended on January 27th. Because of this erroneous allocation of income by Defendant Duke, Ms. Pedro was afraid to deposit the check for fear of later being accused of acting improperly.

203. As with almost all of her other inquiries, Defendant Duke did not respond to Ms. Pedro when she attempted to obtain clarification and thereby allay her concerns about depositing the check.

204. Furthermore, Defendant Duke also failed to directly deposit Ms. Pedro's check into her checking account and instead held the check, telling her to retrieve it from its offices in Durham.

205. Ms. Pedro was not able to pick up this check, however, because she lived in Raleigh and did not have a car.

206. Only after causing Ms. Pedro much unnecessary trouble, did Defendant Duke eventually send Ms. Pedro her check.

207. Because she was forced to take a personal leave of absence for medical reasons, Ms. Pedro no longer received income or benefits from Defendant Duke once her PTO had been depleted.

208. Moreover, because Defendant Duke had disciplined Ms. Pedro prior to her entering unpaid administrative leave, she was ineligible to participate in its PTO donation program, which would have provided her an opportunity for income.

39

209. As a result of Defendant Duke's canceling of her health insurance and denying her income, Ms. Pedro was unable to obtain the trauma counseling and treatment she required.

210. Additionally, by letter dated October 19, 2016, Defendant Duke had accepted Ms. Pedro into its competitive Nurse Loan Forgiveness Program, by which it would satisfy the balance of Ms. Pedro's remaining student loans. To date, Defendant Duke has made no such payments.

211. Furthermore, Defendant Duke failed to provide Ms. Pedro testing to follow up on the HIV exposure she received during her treatment of an HIV-positive patient at Defendant Duke, and Ms. Pedro was unable to afford such testing due to her loss of income from Defendant Duke.

212. Thus, following Ms. Pedro's initial request for a religious accommodation, her subsequent request for a second religious accommodation, and her decision to engage in other forms of protected conduct, Defendant Duke treated Ms. Pedro differently than other, similarly situated employees. Such treatment was motivated by Ms. Pedro's religion and was in retaliation for engaging in activity protected by Title VII. Ms. Pedro was also subjected to a hostile work environment that was permeated with harassment by Defendant Duke. Additionally, she suffered severe harassment from fellow employees that was the result of Defendant Duke failing to correct, and even initiating, said harassment.

40

213. At all times relevant to the series of event described above, Defendant Duke's employees and agents—including Ms. Denis, Ms. Falise, Mr. DeMarco, Ms. O'Connor, Ms. Brooks, Ms. Smith, Ms. May, Ms. Dietch, Ms. Clinton, Ms. Spurney, Ms. Mullis, and Ms. Hendricks—were acting within the course and scope of their employment or agency relationship with Defendant Duke.

214. The acts and omissions of Defendant Duke's employees and agents in this case—including Ms. Denis, Ms. Falise, Mr. DeMarco, Ms. O'Connor, Ms. Brooks, Ms. Smith, Ms. May, Ms. Dietch, Ms. Clinton, Ms. Spurney, Ms. Mullis, and Ms. Hendricks—are imputable to both Defendant Duke University and Defendant Duke University Health System, Inc., under the doctrines of *respondeat superior* and vicarious liability.

215. Defendant Duke engaged in discriminatory practices with malice or with reckless indifference to Ms. Pedro's federally protected rights.

216. Furthermore, Defendant Duke discriminated in the face of a perceived risk that its actions would violate federal law.

*Effects of Defendant Duke's*
*Violation of Ms. Pedro's Civil Rights*

217. Ms. Pedro is currently suffering from Post-Traumatic Stress Disorder ("PTSD").

41

218. The actions of Defendant Duke have also exacerbated Ms. Pedro's preexisting medical conditions, including asthma, an injury to her back, and an autoimmune disorder.

219. The actions of Defendant Duke described above (and to be more fully established by the proof at trial), constitute the direct and proximate cause of Ms. Pedro's current manifestation of PTSD and current problems associated with her other medical issues.

220. Though she desires to work, Ms. Pedro's PTSD and other injuries preclude her from regularly engaging in gainful employment, resulting in a nearly total loss of income.

221. Ms. Pedro's PTSD is expected to preclude her from regularly engaging in gainful employment for the foreseeable future.

222. Ms. Pedro suffers significant psychological and emotional distress on a daily basis as a direct and proximate result of the actions of Defendant Duke.

223. Due to her lack of income, Ms. Pedro was evicted from her apartment in Raleigh by a Wake County Sheriff's deputy. Ms. Pedro then returned to the New York City area, which she could only accomplish by taking a bus. Consequently, she had to abandon countless personal possessions by leaving them in her Raleigh apartment.

224. She has suffered other consequential injuries from her loss of income.

225. Ms. Pedro's loss of income, loss of personal property, and other related injuries are the direct and proximate result of Defendant Duke's actions.

## COUNT I:
## Religious Discrimination in
## Violation of Title VII
## (Disparate Treatment)

226. The preceding paragraphs are hereby realleged and incorporated herein by reference.

227. Religion constitutes a protected class under Title VII.

228. Ms. Pedro's supervisors at Defendant Duke do not hold Ms. Pedro's same religious beliefs.

229. Ms. Pedro was subjected to adverse employment actions by Defendant Duke.

230. Ms. Pedro's protected status (religion) was a motivating factor in the decisions of Defendant Duke that constituted adverse employment actions.

231. The above allegations of this complaint describe conduct that constitutes direct evidence of invidious discrimination on the basis of religion in violation of Title VII.

43

232. At the time Defendant Duke took adverse employment actions against Ms. Pedro, Ms. Pedro's job performance was satisfactory.

233. At the time Defendant Duke took adverse employment actions against Ms. Pedro, Ms. Pedro was qualified for her position and for the position(s) for which she applied.

234. Employees outside of the protected class were treated more favorably than Ms. Pedro, including by receiving promotions from "orientation" status and by receiving clinical ladder promotions like that for which Ms. Pedro applied.

235. Upon information and belief, Defendant Duke has actively discriminated against others who hold pro-life religious views on prior occasions.

236. Defendant Duke's discrimination against Ms. Pedro was intentional.

237. Defendant Duke's discrimination against Ms. Pedro on the basis of her religion took several forms.

238. Defendant Duke discriminated against Ms. Pedro on the basis of her religion in numerous specific ways, including but not limited to the following: (1) its failure to promote Ms. Pedro from "orientation" to regular status and denying Ms. Pedro a clinical ladder promotion; (2) its repeated disciplining of Ms. Pedro, wrongfully and without basis, in ways that would

44

negatively affect her professional standing (both with Defendant Duke and generally) and her licensure; (3) its denial and interference in myriad ways with Ms. Pedro's receipt of income and fringe benefits, including insurance, from Defendant Duke; (4) its placing Ms. Pedro on administrative leave and later compelling her to take an unpaid personal leave of absence for medical reasons; (5) failing to make any payments under the Nurse Loan Forgiveness Program; and (6) other ways described in this complaint or otherwise to be established by the proof at trial.

239. Defendant Duke lacked any justification for the adverse employment actions taken against Ms. Pedro.

240. Any justification offered by Defendant Duke for its adverse employment actions is either false or insufficient to support the nature of the adverse employment actions taken.

241. Defendant Duke therefore violated Title VII, and Ms. Pedro is entitled to the relief set out more fully below, including compensatory damages, back pay, front pay, compensation for benefits under the Nurse Loan Forgiveness Program, past and future medical and counseling expenses, interest, and reasonable attorneys' fees and costs of the action.

242. The events described here further justify an award of punitive damages under Title VII.

## COUNT II:
### Religious Discrimination in
### Violation of Title VII
### (Harassment/Hostile Work Environment)

243.   The preceding paragraphs are hereby realleged and incorporated herein by reference.

244.   Defendant Duke also subjected Ms. Pedro to harassment and a hostile work environment because of her religion.

245.   The statements of Ms. Falise during training regarding Defendant Duke's policy on religious accommodations and abortion constituted *quid pro quo* harassment on the basis of religion in violation of Title VII.

246.   The statements of Ms. Falise during training regarding Defendant Duke's policies constituted part of a hostile work environment.

247.   Additionally, the harassment and hostile work environment suffered by Ms. Pedro on account of her religion further arose from a series of actions by Defendant Duke that include, but are not limited to, the following:

a.   Imposing discipline on Ms. Pedro for baseless, unsubstantiated, and ultimately pretextual reasons;

b.   Imposing discipline that negatively affects Ms. Pedro's professional standing and/or licensure;

c.   Violating its own internal policies and procedures regarding the imposition of discipline on employees;

46

d.  Failing to articulate objective benchmarks by which to measure Ms. Pedro's progress as an employee;

e.  Failing to properly communicate with Ms. Pedro;

f.  Keeping Ms. Pedro on "orientation" status longer than necessary and without cause, thereby subjecting her to embarrassment and ridicule;

g.  Denying Ms. Pedro the clinical ladder promotion she sought;

h.  Failing to take steps to address harassing and hostile comments made to Ms. Pedro by co-workers and otherwise failing to address hostile actions directed toward Ms. Pedro;

i.  Sharing sensitive information about Ms. Pedro's employment status with her co-workers and even initiating harassment of Ms. Pedro;

j.  Interfering with an internal investigation by its own human resources personnel into Ms. Pedro's allegations of unlawful discrimination and harassment;

k.  Unreasonably delaying a decision on Ms. Pedro's second request for a religious accommodation;

l.  Misleading Ms. Pedro about when she might receive a decision on her second request for a religious accommodation as well as about other aspects of her request;

47

m. Not allowing Ms. Pedro to work while her second request for a religious accommodation was pending;

n. Attempting to force Ms. Pedro to engage in *ex parte* discussions with employees or agents of Defendant Duke related to her EEOC charge, and expressly denying Ms. Pedro the right to have the assistance of counsel during such discussions;

o. Forcing Ms. Pedro into taking a personal leave of absence due to medical reasons, thereby denying her pay and fringe benefits, including health insurance;

p. Wrongfully classifying Ms. Pedro's absence on January 28, 2017, as "unscheduled" and therefore subject to discipline;

q. Forcing Ms. Pedro to pay for her own recertification exam and charging her a fee for not attending her previously scheduled ACLS class at Defendant Duke;

r. Preventing Ms. Pedro from participating in Defendant Duke's PTO leave sharing program;

s. Failing to timely pay Ms. Pedro and imposing unjustified obstacles to, and delays in, Ms. Pedro's receipt of her pay;

t. Violating federal and state wage and hour laws;

48

u. Exposing Ms. Pedro to HIV in the course of her work and then failing to provide follow up HIV testing after denying her the economic means to obtain testing herself;

v. Failing to make any payments under the Nurse Loan Forgiveness Program;

w. Failing to update and maintain correct contact information with her insurers, thereby affecting her receipt of benefits;

x. Failing to respond to numerous inquiries regarding important employment issues; and/or

y. Other ways to be established by the proof at trial.

248. This course of conduct by Defendant Duke was motivated by Ms. Pedro's religion, including her religious beliefs and practices.

249. As such, Defendant Duke engaged in a series of separate acts which constitute one unlawful employment practice for purposes of anti-discrimination law.

250. The harassing conduct was so severe and pervasive that a reasonable person in Ms. Pedro's position would find her work environment to be hostile or abusive.

251. Defendant Duke has no training program to specifically educate its managers and other employees on the need to respect pro-life religious views or religious views that oppose vaccinations.

49

252. Ms. Pedro complained of harassment to Defendant Duke. Nevertheless, Defendant Duke did nothing to remedy it.

253. Defendant Duke therefore violated Title VII, and Ms. Pedro is entitled to the relief set out more fully below, including compensatory damages, back pay, front pay, compensation for benefits under the Nurse Loan Forgiveness Program, past and future medical and counseling expenses, interest, and reasonable attorneys' fees and costs of the action.

254. The events described here further justify an award of punitive damages under Title VII.

**COUNT III:**
**Religious Discrimination in**
**Violation of Title VII**
**(Denial of Religious Accommodation)**

255. The preceding paragraphs are hereby realleged and incorporated herein by reference.

256. Defendant Duke further discriminated against Ms. Pedro by failing to grant (and/or constructively denying) her second request for religious accommodation of her sincerely held religious beliefs and religious practices.

257. Ms. Pedro's *bona fide* religious beliefs and practices conflict with certain of Defendant Duke's employment requirements.

258. Ms. Pedro brought this conflict to the attention of Defendant Duke.

259. Ms. Pedro's religious beliefs and practices were the basis for Defendant Duke's adverse employment actions.

260. Accommodating Ms. Pedro's second request for religious accommodation would not have imposed an undue hardship on Defendant Duke.

261. Defendant Duke therefore violated Title VII, and Ms. Pedro is entitled to the relief set out more fully below, including compensatory damages, back pay, front pay, compensation for benefits under the Nurse Loan Forgiveness Program, past and future medical and counseling expenses, interest, and reasonable attorneys' fees and costs of the action.

262. The events described here further justify an award of punitive damages under Title VII.

### COUNT IV:
### Retaliation in
### Violation of Title VII

263. The preceding paragraphs are hereby realleged and incorporated herein by reference.

264. Ms. Pedro engaged in activity protected by Title VII on several occasions while employed by Defendant Duke, including (but not limited to) making requests for religious accommodation, complaining about perceived discrimination and harassment, and filing a charge with the EEOC.

51

265. As set forth in the preceding paragraphs of this complaint, Defendant Duke subjected Ms. Pedro to adverse employment actions at the time, and after, her protected conduct took place.

266. These adverse employment actions were serious enough that they well might have discouraged a reasonable worker from engaging in protected activity.

267. Ms. Pedro was subjected to these adverse employment actions because of her protected conduct.

268. Defendant Duke therefore violated Title VII, and Ms. Pedro is entitled to the relief set out more fully below, including compensatory damages, back pay, front pay, compensation for benefits under the Nurse Loan Forgiveness Program, past and future medical and counseling expenses, interest, and reasonable attorneys' fees and costs of the action.

269. The events described here further justify an award of punitive damages under Title VII.

## COUNT V:
### Constructive Discharge in
### Violation of Title VII

270. The preceding paragraphs are hereby realleged and incorporated herein by reference.

271. To the extent it is found that Ms. Pedro left her employment with Defendant Duke without being formally terminated, such action was the

result of conditions so intolerable that a reasonable person in Ms. Pedro's position would feel compelled to resign. Therefore, such action constitutes a constructive discharge in violation of Title VII.

272.  Defendant Duke therefore violated Title VII, and Ms. Pedro is entitled to the relief set out more fully below, including compensatory damages, back pay, front pay, compensation for benefits under the Nurse Loan Forgiveness Program, past and future medical and counseling expenses, interest, and reasonable attorneys' fees and costs of the action.

273.  The events described here further justify an award of punitive damages under Title VII.

## COUNT VI:
## Termination in Violation of
## North Carolina Public Policy

274.  The preceding paragraphs are hereby realleged and incorporated herein by reference.

275.  To the extent that Defendant Duke has terminated, or will in the future terminate, Ms. Pedro's employment, such termination (whether actual or constructive) was unlawful and in violation of North Carolina public policy.

276.  Defendant Duke's action therefore gives rise to a claim pursuant to the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143-422.2, and North Carolina common law.

277.   As a natural, foreseeable, and proximate result of the wrongful acts alleged herein, Ms. Pedro has suffered loss of income and severe emotional distress and mental anguish as well as injury to her reputation.

278.   Accordingly, Ms. Pedro is entitled to the relief set out more fully below, including compensatory damages, back pay and front pay, compensation for benefits under the Nurse Loan Forgiveness Program, as well as past and future medical and counseling expenses and interest.

**COUNT VII:**
**Violation of the**
**Fair Labor Standards Act**

279.   The preceding paragraphs are hereby realleged and incorporated herein by reference.

280.   Defendant Duke failed to timely pay Ms. Pedro certain wages and benefits (including benefits under the Nurse Loan Forgiveness Program) she was owed.

281.   Defendant Duke's failure to make timely payment of Ms. Pedro's wages and benefits violated the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.*

282.   Defendant Duke's failure to pay Ms. Pedro did not result from good faith and reasonable grounds for believing that its act or omission was not a violation of the Fair Labor Standards Act.

Case 1:17-cv-00985-CCE-JEP   Document 1   Filed 10/27/17   Page 54 of 61

283. Defendant Duke is liable to Ms. Pedro for compensatory and liquidated damages as well as attorneys' fees, expenses, and costs of the action under 29 U.S.C. § 216(b).

## COUNT VIII:
## Violation of the
## North Carolina Wage & Hour Act

284. The preceding paragraphs are hereby realleged and incorporated herein by reference.

285. From August 2016 to the present, Defendant Duke has been Ms. Pedro's "employer" within the meaning of N.C. Gen. Stat. § 95-25.2(5) in that it acted directly or indirectly in the interest of an employer in relation to Ms. Pedro.

286. From August 2016 to the present, Ms. Pedro has been an "employee" of Defendant Duke within the meaning of N.C. Gen. Stat. § 95-25.2(4).

287. As described above, Defendant Duke failed to pay Ms. Pedro certain wages and benefits (including benefits under the Nurse Loan Forgiveness Program) within the time periods mandated pursuant to North Carolina law, including N.C. Gen. Stat. § 95-25.6 and/or N.C. Gen. Stat. § 95-25.7.

288. Defendant Duke knew that it owed Ms. Pedro these wages and benefits.

289.   Defendant Duke nonetheless failed to tender them in a timely manner.

290.   Defendant Duke failed to tender these wages and benefits in the usual and customary manner.

291.   As a direct and proximate result of Defendant Duke's failures, Ms. Pedro suffered unreasonable delay and difficulty in receiving wages and benefits that Defendant Duke was legally obligated to pay her.

292.   Defendant Duke's violations of the North Carolina Wage and Hour Act were knowing and willful.

293.   Accordingly, Ms. Pedro is entitled to compensatory damages as well as liquidated damages pursuant N.C. Gen. Stat. § 95-25.22(a1) in addition to interest under N.C. Gen. Stat. § 24-1, and attorneys' fees, costs, and fees related to bringing this action pursuant to N.C. Gen. Stat. § 95-25.22(d).

## COUNT IX:
### Breach of Contract

294.   The preceding paragraphs are hereby realleged and incorporated herein by reference.

295.   A legally valid and enforceable contract exists between Defendant Duke and Ms. Pedro with respect to the Nurse Loan Forgiveness Program.

296.   All conditions precedent to performance of the contract have occurred.

297. No conditions subsequent have excused Defendant Duke's performance.

298. Defendant Duke has breached this contract.

299. Defendant Duke's breach of contract was unjustified and without cause.

300. Ms. Pedro has been damaged by Defendant Duke's breach of contract.

301. Accordingly, Ms. Pedro is entitled to damages for Defendant Duke's breach of contract.

## COUNT X:
## Breach of the Covenant of
## Good Faith and Fair Dealing

302. The preceding paragraphs are hereby realleged and incorporated herein by reference.

303. Defendant Duke was under an obligation to act in good faith and with fair dealing as to the terms of the contract it had with Ms. Pedro for repayment of her student loans under the Nurse Loan Forgiveness Program.

304. Defendant Duke has breached its obligation to act in good faith and with fair dealing with respect to repayment of Ms. Pedro's student loans under the Nurse Loan Forgiveness Program.

305. Defendant Duke's breach of the covenant of good faith and fair dealing was unjustified and without cause.

57

306. Ms. Pedro has been harmed as a result of Defendant Duke's breach of the covenant of good faith and fair dealing.

307. Accordingly, Ms. Pedro is entitled to damages for Defendant Duke's breach of the covenant of good faith and fair dealing.

## COUNT XI:
## Intentional Infliction of
## Emotional Distress

308. The preceding paragraphs are hereby realleged and incorporated herein by reference.

309. As described above, Defendant Duke has engaged in extreme and outrageous conduct, which was intended to cause severe emotional distress.

310. Defendant Duke's conduct has been without legal justification.

311. Ms. Pedro has in fact sustained severe emotional distress as a direct and proximate result of Defendant Duke's conduct, entitling her to an award of compensatory damages, including past and future loss of income, compensation for benefits under the Nurse Loan Forgiveness Program, and past and future medical and counseling expenses.

## COUNT XII:
## Negligent Infliction of
## Emotional Distress

312. The preceding paragraphs are hereby realleged and incorporated herein by reference.

Case 1:17-cv-00985-CCE-JEP   Document 1   Filed 10/27/17   Page 58 of 61

313.    Alternatively, the actions of Defendant Duke negligently inflicted emotional distress upon Ms. Pedro.

314.    Defendant Duke owed a duty of care to Ms. Pedro.

315.    Defendant Duke negligently breached that duty.

316.    Defendant Duke was negligent in the following respects:

    a.  Violating its own internal policies regarding employee discipline;

    b.  Failing to reasonably manage its response to allegations of discrimination, harassment, and retaliation;

    c.  Failing to take reasonable steps to protect Ms. Pedro following her complaints of discrimination, harassment, and retaliation;

    d.  Failing to properly manage Ms. Pedro's leave days, income, and fringe benefits so as to ensure she received what she was entitled to receive;

    e.  Providing incorrect wage payments and failing to promptly correct or clarify its errors;

    f.  Exposing Ms. Pedro to HIV in the course of her work and then failing to provide follow up HIV testing after denying her the economic means to obtain testing herself; and/or

    g.  Other ways to be established by the proof at trial.

317.    It was reasonably foreseeable that this negligent conduct would cause Ms. Pedro severe emotional distress and mental anguish.

59

318. As a direct and proximate result of Defendant Duke's negligence, Ms. Pedro has in fact sustained severe emotional distress and mental anguish, entitling her to an award of compensatory damages, including past and future loss of income, compensation for benefits under the Nurse Loan Forgiveness Program, and past and future medical and counseling expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sara Theresa Pedro respectfully prays that the Court grant her the following relief:

1. Grant her a trial by jury on all claims so triable;

2. Grant her compensatory damages for back pay, lost fringe benefits, benefits under the Nurse Loan Forgiveness Program, past and future medical and counseling expenses, past and future emotional distress, past and future pain and suffering, past and future loss of enjoyment of life, loss of personal property, expenses necessary to secure new employment, and past and future injury to her reputation;

3. Grant her an award of front pay, including future fringe benefits;

4. Grant her an award of punitive damages pursuant to 42 U.S. Code § 1981a(b)(1);

5. Grant her liquidated damages pursuant to 29 U.S.C. § 216(b) and N.C. Gen. Stat. § 95-25.22(a1);

6. Grant her prejudgment and post-judgment interest;

7.    Grant her attorneys' fees and costs pursuant 42 U.S.C. § 2000e-5(k), 29 U.S.C. § 216(b), N.C. Gen. Stat. § 95-25.22(d), and as may be otherwise allowed by applicable law;

8.    Tax costs of this action against Defendant Duke University and/or Defendant Duke University Health System, Inc.; and

9.    Grant her such other and further relief as the Court may deem just and proper.

Respectfully submitted, this the <u>27th</u> day of October, 2017.

THOMAS MORE LAW CENTER

<u>BY: s/B. Tyler Brooks</u>
B. Tyler Brooks, N.C. Bar No. 37604*
Kate Oliveri, Mich. Bar No. P79932†
24 Frank Lloyd Wright Drive
Suite J 3200
Ann Arbor, Michigan 48106
Telephone: (734) 827-2001
Fax: (734) 930-7160
tbrooks@thomasmore.org
koliveri@thomasmore.org

*Admitted to practice law in North Carolina, South Carolina, and Tennessee. Not admitted to practice law in Michigan.

† *Pro hac vice* pursuant to L.R. 83.1(d).

61